ORIGINAL

FLORENCE T. NAKAKUNI #2286
United States Attorney
District of Hawaii

LESLIE E. OSBORNE # 3740
Chief, Criminal Division

MARSHALL SILVERBERG #5111
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone:  (808) 440-9259
E-Mail: marshall.silverberg@usdoj.gov

DANIEL W. DOOHER
Senior Trial Attorney
Environmental Crimes Section
U.S. Department of Justice
601 D Street, N.W.  Room 2108
Washington, D.C.  20004
Telephone: (202) 305-0351
E-Mail: Daniel.Dooher@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 30 2014

at ____ o'clock and ____ min. ____ M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>WASTE MANAGEMENT OF (01) )<br>    HAWAII, INC. )<br>JOSEPH R. WHELAN, (02) )<br>JUSTIN H. LOTTIG, (03) )<br><br>Defendants. )<br>_____ ) | CR. NO.  CR 14-00468 SOM<br><br>INDICTMENT<br><br>COUNT 1: 18 U.S.C. § 371<br>COUNTS 2-4, 12-13: 33 U.S.C.<br>    §§ 1318(a) & 1319(c)(4)<br>COUNT 5: 33 U.S.C.<br>    §§ 1318(a) & 1319(c)(2)(A)<br>COUNTS 6, 9: 33 U.S.C.<br>    §§ 1311(a) & 1319(c)(2)(A)<br>COUNTS 7, 8, 10, 11: 18 U.S.C.<br>    § 1001(a)(2) |

INDICTMENT

The Grand Jury charges that at all times material to this Indictment:

## INTRODUCTORY ALLEGATIONS

### I.   IDENTIFICATION OF THE DEFENDANTS AND OTHERS

#### (a). Defendant WASTE MANAGEMENT OF HAWAII, INC.

1.   WASTE MANAGEMENT OF HAWAII, INC. ("WMH"), was a Delaware corporation, which did business in the District of Hawaii.  It operated the Waimanalo Gulch Sanitary Landfill ("WGSL") pursuant to a contract it had with the City and County of Honolulu, which owned the WGSL.

#### (b). Defendant JOSEPH R. WHELAN

2.   Defendant JOSEPH R. WHELAN ("WHELAN"), was the General Manager and Vice President of WMH, and, in that dual capacity, was an agent of WMH.  WHELAN was responsible for ensuring that the WGSL operated properly in full compliance with all state and federal laws and regulations and all permits issued by the State of Hawaii Department of Health ("DOH").

#### (c). Defendant JUSTIN H. LOTTIG

3.   Defendant JUSTIN H. LOTTIG ("LOTTIG"), as the Environmental Protection Manager of WMH, was an agent of WMH. In that capacity, LOTTIG was responsible for the daily management of the environmental protection programs at the WGSL, including the preparation of its permit applications and compliance with any permits issued by the DOH.

1

### (d). Unindicted agent J.F.

4.     J.F., as the site engineer for the WGSL, was an agent of WMH.

### (e). Unindicted co-conspirator L.K.

5.     L.K. was an area Environmental Protection Manager with WMH's parent company, Waste Management, Inc.  She supervised LOTTIG in overseeing WMH's compliance with environmental laws and regulations.

## II.   UNINDICTED COMPANY ABC (an alias)

6.     Unindicted Company ABC, Inc. (an alias) was an environmental consulting firm, with offices in Honolulu, Hawaii. In 2010, Company ABC had a contract with WMH to: (a) assist WMH in the preparation of documents to obtain permits issued by the DOH for WMH to operate the WGSL; (b) assist WMH in the preparation of documents to report to the DOH on whether WMH was in compliance with those permits; and (c) to assist WMH in its actual compliance with federal and state environmental laws and regulations at the WGSL.

### (a). Unindicted co-conspirator M.M.

7.     During the relevant time period in 2010, unindicted co-conspirator M.M. ("M.M.") was the head of the environmental planning department for Company ABC in Honolulu, Hawaii.  M.M. participated in and supervised the preparation of documents on behalf of WMH and Company ABC for the WGSL.

2

(b). **Unindicted co-conspirator T.K.**

8.  Unindicted co-conspirator T.K. ("T.K.") was an environmental planner for Company ABC. T.K. participated in the preparation of documents on behalf of WMH for the WGSL.

### III.  CRIMINAL LIABILITY OF CORPORATIONS FOR THE ACTS OF THEIR AGENTS

9.  A corporation can act only through its agents, including, but not limited to, its employees, officers, and its contractors.  A corporation may be criminally culpable for the criminal acts of its agents done or made within the scope of their authority and on behalf of the corporation.

### IV.  THE CLEAN WATER ACT

10.  The Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., was enacted by Congress to restore and maintain the chemical, physical, and biological quality of the Nation's waters, *Id.* at § 1251(a); to prevent, reduce, and eliminate water pollution in the United States; and to conserve the waters of the United States for the protection and propagation of fish and aquatic life and wildlife, recreational purposes, and the use of such waters for public drinking water, agricultural, and industrial purposes.  *Id.* at § 1252(a).

11.  The CWA prohibits the discharge of any "pollutant" by any "person" from a "point source" into "navigable waters" except in compliance with a permit issued under the National Pollutant Discharge Elimination System

3

("NPDES") by the United States Environmental Protection Agency ("EPA") or a state approved by EPA to administer the NPDES program. *Id.* at §§ 1311(a) and 1342.

12. The term "pollutant" means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water." *Id.* at § 1362(6). "Contaminated storm water means storm water which comes in direct contact with landfill wastes. . . ." 40 C.F.R. § 445.2(b).

13. The term "person" includes an individual and a corporation. 33 U.S.C.§ 1362(5).

14. The term "point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . from which pollutants are or may be discharged." *Id.* at § 1362(14). The WGSL's sedimentation basin and two discharge pipes, as well as three outfall pipes used by the WGSL, were point sources under the CWA.

15. The term "navigable waters" means "the waters of the United States, including the territorial seas." *Id.* at § 1362(7). The term "territorial seas" includes Hawaii's coastal waters and extending three miles offshore. *Id.* at 1362(8).

4

16.   The CWA uses two water-quality-performance standards by which a discharger of water may be evaluated -- "effluent limitations" and "water-quality standards."  An effluent limitation is any restriction established by a state or the EPA on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters.  *Id*. at § 1362(11).  More stringent limitations may be imposed to meet applicable water quality standards.  *Id*. at § 1311(b)(1)(C).

## V.   THE CLEAN WATER ACT IMPLEMENTED AND ENFORCED IN THE STATE OF HAWAII

17.   The State of Hawaii, through its Department of Health, has been approved by EPA under Section 402(b) of the CWA to administer the NPDES program, including the issuance of NPDES permits allowing the discharge of storm water from a facility to a navigable water.  39 Fed. Reg. 43759 (Dec. 18, 1974).  The EPA retains authority to enforce the CWA. 33 U.S.C. § 1342(i).

### (a).  General Permit Segment of the Approved NPDES Program

18.   The Department of Health, Clean Water Branch ("DOH-CWB") has adopted an NPDES General Permit for storm water discharges (the "General Permit"), and it is comprised of the conditions set forth at Title 11, Hawaii Administrative Rules ("HAR"), including, *inter alia*, Sections 11-55-34.04(a), 34.07, 34.11, 34.12; HAR, Chapter 11-55, Appendix A, DOH Standard

5

General Permit Conditions; HAR, Chapter 11-55, Appendix B, NPDES General Permit Authorizing Discharges of Storm Water Associated with Industrial Activities ("Appendix B").  Landfills are among the covered industrial activities which require a permit for storm water discharges. 40 C.F.R. § 122.26(b)(14)(v).

19.  "Any person who discharges under a general permit shall comply with section 11-55-34.04, all general permit standard conditions, all applicable special conditions, and all applicable additional notice of general permit coverage conditions."  11 HAR 55-34.12.  Discharges covered by the General Permit shall comply with the applicable sections of state water quality standards in chapter 11-54 and chapter 11-55.  11 HAR 55-34.04(a).  "The permittee shall not cause or contribute to a violation of the basic water quality criteria as specified in section 11-54-4."  Appendix B at § 8(b)(1).

20.  Hawaii's State Water Quality Standards provide:

(a) All waters shall be free of substances attributable to domestic, industrial, or other controllable sources of pollutants, including:

(1) Materials that will settle to form objectionable sludge or bottom deposits;

(2) Floating debris, oil, grease, scum, or other floating materials;

(3) Substances in amounts sufficient to produce taste in the water or detectable off-flavor in the flesh of fish, or in amounts sufficient to produce objectionable color, turbidity or other conditions in the receiving waters;

> (4) . . . pathogenic organisms; . . . or other
> deleterious substances at levels or in
> combinations sufficient to be toxic or harmful to
> human, animal, plant, or aquatic life, or in
> amounts sufficient to interfere with any
> beneficial use of the water; . . . .
>
> (6) Soil particles resulting from erosion on land
> involved in earthwork, such as the construction
> of public works; . . or industrial developments.

11 HAR 54-4(a).

21.  In addition, in marine recreational waters, under

the State Water Quality Standards, the following applies:

> (1) Within 300 meters (one thousand feet) of the
> shoreline, including natural public bathing or wading
> areas, enterococcus content shall not exceed . . . the
> single sample maximum of 104 CFU per 100 milliliters
> [of water]. . . .

11 HAR 54-8(b).  "CFU" is an abbreviation for "colony-forming

units" and it is the measurement by which enterococcus levels

are calculated.  Enterococcus is an enteric bacteria, which is

used as an indicator in the environment of sewage, sewage

sludge, and other fecal contamination.  Enterococcus itself is a

pollutant under the CWA.

### (b). Notice of General Permit Coverage Segment of the Approved NPDES Program

22.  The HAR requires that a landfill owner or its

duly authorized representative to file a Notice of Intent

("NOI") to be covered by the General Permit. 11 HAR 55-34.08(a);

Appendix B at § 4(a).  The NOI must "[b]e accompanied by all

pertinent information which the director may require in order to

7

establish effluent limitations or best management practices,
including, but not limited to, complete engineering reports,
schedule of progress, plans, specifications, maps, measurements,
quantitative and qualitative determinations, records, and all
related materials." 11 HAR 55-34.08(b)(3). All materials
submitted with an NOI "shall be complete and accurate." 11 HAR
55-34.08(d).

23. The landfill owner or its duly authorized
representative is required to submit a storm water pollution
control plan ("SWPCP") with its NOI. Appendix B at § 4(b)(5).
The SWPCP must contain a "[s]ite map identifying the locations
of drainage structures; . . . [and] structural measures for the
control of storm water. . . " *Id.* at § 6(a)(2).

24. "After receipt of the complete notice of intent,
the director may notify the owner or operator in writing of a
notice of general permit coverage." 11 HAR 55-34.09(b). "The
director may impose conditions in a notice of general permit
coverage or add conditions to an issued notice of general permit
coverage to ensure that the activity or discharge(s) complies
with the terms and conditions of the general permit and to
ensure that state water quality standards will not be violated."
*Id.* The General Permit, plus the conditions and requirements
contained in the Notice of General Permit Coverage ("NGPC"),
constitute an "NPDES Permit." 11 HAR 55-01.

## VI.  THE WAIMANALO GULCH SANITARY LANDFILL (WGSL)

### (a). Site Description

25.  The WGSL, comprised of about 198 acres, was located at 92-460 Farrington Highway, Kapolei, Oahu, Hawaii, in the District of Hawaii.  It was owned by the City and County of Honolulu (the "City") and operated on the City's behalf by WMH. Municipal solid waste was disposed of and buried in the WGSL in areas known as "cells."

26.  The WGSL was located mauka of the Ko Olina resort and residential community and within a canyon.  It could be impacted by storm water flowing down from further up canyon.

### (b). The 2005 NPDES Permit for the WGSL

27.  On March 2, 2005, the DOH-CWB issued a Notice of General Permit Coverage, File No. HI R50A533, ("2005 NGPC"), permitting storm water discharges from the WGSL under the General Permit, thereby issuing an NPDES Permit to the City for the WGSL ("2005 NPDES Permit").

### (c). The January 29, 2009, Notice of Intent

28.  On January 29, 2009, WHELAN and WMH submitted a new NOI to the DOH-CWB, in order to obtain renewal of the 2005 NPDES Permit for the WGSL.

### (d). The DOH-CWB email of April 13, 2010

29.  On April 13, 2010, the DOH-CWB sent an email to WHELAN and WMH informing them that the new NOI submitted on

9

January 29, 2009 (and other information provided on July 17, 2009), was incomplete. The email included nine sets of comments or questions regarding the status and condition of the WGSL, including its storm water diversion system. It also instructed WHELAN and WMH to submit a Revised CWB NOI General Form and Form B and any attachments to support their submittal.

### (e). The WMH/City response to the DOH-CWB email of April 13, 2010

30. On June 15, 2010, LOTTIG, on behalf of WMH, filed a Response to Comments ("RTC") and a revised NOI, including a revised "Form B," with the DOH-CWB.

### (f). The renewed NPDES permit for the WGSL

31. On August 30, 2010, the DOH-CWB issued a renewed Notice of General Permit Coverage, File No. HI R50A533 ("2010 NGPC"), permitting storm water discharges from the WGSL under the General Permit, thereby issuing an NPDES Permit to the City and WMH for the WGSL ("2010 NPDES Permit").

32. Condition No. 3 of the 2010 NGPC required WHELAN and WMH to "[i]mplement, operate, and maintain the facility's SWPCP to ensure that storm water discharges associated with industrial activities will not cause or contribute to a violation of applicable State water quality standards (WQS)."

33. Condition No. 7 of the 2010 NGPC required that WMH comply with the January 2009 SWPCP (Rev. 3), and all submittals filed after the NOI dated October 5, 2007, which

included the Form B filed on June 15, 2010, with the January

2009 SWPCP (Rev. 3).  In addition, Appendix B, Section 6(a) of

the NPDES permit required that the "permittee shall develop and

implement a storm water pollution control plan [SWPCP] to

minimize the discharge of pollutants in storm water runoff and

to maintain compliance with conditions of this general permit."

> **(g). The storm water management system in place at the WGSL on December 19, 2010.**

34.  In late 2009, WMH began construction of an

expansion of the WGSL, including what became Cell E6.  As part

of that construction, on February 9, 2010, the primary drainage

structures, that is, two 48-inch pipes, their inlets, and an

approximately 25-foot headwall used to divert up canyon storm

water away from the waste buried in the landfill, were removed

or otherwise made non-functional.  Cell E6 went operational on

October 22, 2010.  At that time, there was not an effective

storm water management system in place at the WGSL to handle

storm water from a 24-hour, 25-year storm, as required by Hawaii

state law (11 HAR 58.1-15(g)(1)).

\ \

\ \

\ \

\ \

<u>COUNT 1</u>
(conspiracy to defraud the United States)
(18 U.S.C. § 371)

The Grand Jury further charges that:

1.   The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34 are re-alleged and incorporated herein.

I.   <u>THE CHARGE</u>

2.   From on or before April 19, 2010, through December 23, 2010, in the District of Hawaii and elsewhere, defendants

> (a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agent JUSTIN H. LOTTIG, acting within the scope of his authority and on behalf of WMH; and

> (b)   JUSTIN H. LOTTIG, individually,

did knowingly and willfully conspire and agree with each other and with unindicted co-conspirators L.K., M.M., and T.K. to commit the following objects of the conspiracy:

> (a) to defraud the United States by dishonest and deceitful means, for the purpose of impairing and defeating the lawful functions of the DOH-CWB, in the administration of the federal NPDES program, as approved by the United States Environmental Protection Agency; and

> (b) to commit offenses against the United States of America, that is, the submission of documents to the DOH-CWB which contained materially false statements and representations, and the failure to provide other required documents and information, in violation of the Clean Water Act, 33 U.S.C. §§ 1318(a) and 1319(c)(4).

## II.  THE MANNER AND MEANS OF THE CONSPIRACY

3.   The dishonest and deceitful manner and means by which the conspiracy was accomplished was through:

>  (a) the preparation and filing of three documents: a "Response to April 13, 2010 Comments" dated June 15, 2010; a Surface Water Management Plan ("SWMP"), dated August 30, 2010; and a letter dated September 21, 2010, all of which had false material statements and representations; and

>  (b) the failure to inform the DOH-CWB of material changes to the storm water diversion system, as required by the 2005 NGPC and the 2010 NGPC.

## III. OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY:

4.   In furtherance of the conspiracy, and to effect the objects described above, the following overt acts, among others, were committed in the District of Hawaii and elsewhere:

>  (a).  On April 19, 2010, LOTTIG, L.K, M.M., and T.K. met at the WGSL and agreed to submit outdated information and figures to the DOH-CWB in order to obtain a renewed NPDES Permit for the WGSL.

>  (b).  On June 2, 2010, LOTTIG emailed T.K., stating "The two 48-inch CMPs [corrugated metal pipes] are still in place, but are no longer functional.  They have temporarily been replaced with one 36-inch HDPE pipe.  The western drainage bypass is currently being installed and will carry all water originating from upcanyon. . . ."

>  (c).  On June 7, 2010, LOTTIG emailed the revised draft of the Response to Comments (RTC) to L.K.

>  (d).  On June 11, 2010, L.K. emailed LOTTIG that she had no comments to the RTC and that it "Looks good."

>  (e).  On June 15, 2010, LOTTIG filed with the DOH-CWB the RTC.  It contained the false statements described in Count 2 of this Indictment.

(f).  On June 29, 2010, at 8:28 a.m., T.K. sent an email to LOTTIG, stating that he "would like to open discussions on the update of the SWMP" and that he was "inclined to use pre-construction/expansion boundaries, features etc., to avoid confusion associated with incomplete construction.  Thoughts?"

(g).  On June 29, 2010, at 2:04 p.m., LOTTIG sent an email responding to T.K.'s email, stating: "I agree. We should use the pre-construction features because of the constant flux associated with the construction. This will give a more accurate representation of actual conditions."

(h).  On August 30, 2010, WHELAN filed the SWMP with the DOH-CWB and it was made part of the WGSL's NPDES permit file.  It contained the false material statements described in Count 3 of this Indictment.

(i).  On September 15, 2010, T.K. sent an email to WHELAN, with copies to LOTTIG and M.M., explaining the actions and goals of the conspiracy, including hiding from the DOH-CWB the effects of the ongoing construction at WGSL, because *there was a question as to whether going from two 48" pipes to a single 36" pipe for off-site water was going to attract undo (sic) attention."* (Emphasis added).

(j).  On September 16, 2010, M.M. sent a draft of a letter updating the SWPCP to WHELAN for review.

(k).  On or about September 21, 2010, WHELAN sent an email to the DOH-CWB, updating the SWPCP.  The letter contained false material statements and representations, which are described in Count 4 of this Indictment.

(l).  From October 27, 2010, through December 23, 2010, the information on file with the DOH-CWB was not updated as charged in Count 5 of this Indictment.

All in violation of Title 18, United States Code, Section 371.

14

<u>COUNT 2</u>
(33 U.S.C. §§ 1318(a) & 1319(c)(4) and 18 U.S.C. § 2)
(false statements and aiding and abetting the same)

The Grand Jury further charges:

1.   The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34 are re-alleged and incorporated herein.

I.   <u>ADDITIONAL INTRODUCTORY ALLEGATIONS</u>

2.   A "Response to April 13, 2010 Comments" (RTC), dated June 14, 2010, prepared in part by WMH and LOTTIG and filed with the DOH-CWB (on behalf of the City) by WMH and LOTTIG on June 15, 2010, stated in part:

(a)   <u>The response to Comment 5c</u>

The response to Comment 5c stated: "All drainage structures are shown and labeled on the updated Site Drainage Features Maps (Figures 3-1A and 3-1B)."  In truth and in fact, as LOTTIG, L.K., M.M., and T.K. well knew, the response to Comment 5c was false because Figure 3-1B intentionally was not updated to show that the two 48-inch pipes were no longer functional and that the inlets to the two 48-inch pipes no longer existed.

(b)   <u>The response to Comment 5d</u>

The response to Comment 5d stated: "The Site Drainage Map (Figures 3-1A and 3-1B) has been updated to show the outline of sub-drainage areas for the entire facility and shows the location of all drainage structures."  In truth and in fact, as LOTTIG, L.K., M.M., and T.K. well knew, the response to Comment 5d was also false because Figure 3-1B had not been updated to show that the two 48-inch pipes were no longer functional and that the inlets to the two 48-inch pipes no longer existed.

(c)   **The response to Comment 9a**

The response to Comment 9a stated: "BMPs are in place to prevent contaminated storm water from coming into contact with landfill wastes."  In truth and in fact, as LOTTIG, L.K., M.M., and T.K. well knew, the response to Comment 9a was false because BMPs were not in place to prevent contaminated storm water from coming into contact with landfill waste.

II. **THE CHARGE**

3.   On or about June 15, 2010, in the District of Hawaii and elsewhere, the defendants

(a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agent JUSTIN H. LOTTIG, acting within the scope of his authority and on behalf of WMH; and

(b)   JUSTIN H. LOTTIG, individually,

did knowingly make, and aid and abet the making of, false material statements and representations in a document filed under Chapter 26 of Title 33 of the United States Code, that is, the Clean Water Act, 33 U.S.C. §§ 1251 et seq., to wit, the "Response to April 13, 2010 Comments," dated June 14, 2010, but filed on June 15, 2010, with the State of Hawaii Department of Health, Clean Water Branch, with the false material statements and representations contained in the Response to Comments as described above in paragraph 2 of this count of the Indictment.

All in violation of Title 33, United States Code, Sections 1318(a) & 1319(c)(4) and Title 18, United States Code, Section 2.

16

<u>COUNT 3</u>
(33 U.S.C. §§ 1318(a) & 1319(c)(4) and 18 U.S.C. § 2)
(false statements and aiding and abetting the same)

The Grand Jury further charges:

1.    The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34 are re-alleged and incorporated herein.

## I.    <u>ADDITIONAL INTRODUCTORY ALLEGATIONS</u>

2.    A "Surface Water Management Plan Waimanalo Gulch Sanitary Landfill" prepared in part by WMH and LOTTIG and filed with the DOH-CWB on August 30, 2010, stated in part:

(a). 3.1   <u>EXISTING DRAINAGE AND EROSION</u>
           <u>CONTROL FEATURES</u>

Section 3.1 stated that "Figure 3-1A and Figure 3-1B illustrate the current site-drainage features based on the most recent topographic map for the site (May 2010)." In truth and in fact, as LOTTIG well knew, those figures did not illustrate the current site-drainage features inasmuch as there no longer was an "Inlet for Two-48" CMP Storm Drain Pipes" and the two 48-inch pipes were no longer functional.

(b). 3.1.4   <u>West Berm</u>

Section 3.1.4 stated that the two 48" pipes had "been replaced with 78 inch diameter fiberglass reinforced pipe" when, in truth and in fact, as LOTTIG well knew, the 78-inch pipe had not been installed.

(c)   <u>Figure 3-1B</u>

Figure 3-1B of the SWMP depicted the current existence of the "Inlet for Two – 48" CMP Storm Drain Pipes," with two buried storm drain pipes transporting storm water below the area which would become Cell E6. The figure was outdated and false, as LOTTIG well knew, because the inlet was gone and the two pipes were no longer functional.

17

## II.  **THE CHARGE**

3.   On or about August 30, 2010, in the District of
Hawaii and elsewhere, the defendants

> (a)  WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its
> agent JUSTIN H. LOTTIG, acting within the scope of his
> authority and on behalf of WMH; and

> (b) JUSTIN H. LOTTIG, individually,

did knowingly make, and aid and abet the making of, false

material statements and representations in a document filed

under Chapter 26 of Title 33 of the United States Code, that is,

the Clean Water Act, 33 U.S.C. §§ 1251 et seq., to wit, the

August 30, 2010, Surface Water Management Plan Waimanalo Gulch

Sanitary Landfill, with such plan being filed on August 30,

2010, with the State of Hawaii Department of Health, Clean Water

Branch, under the Clean Water Act, 33 U.S.C. §§ 1251 et seq.,

with such false material statements and representations being

more fully described above in Paragraph 2 of this count of the

Indictment.

All in violation of Title 33, United States Code,

Sections 1318(a) and 1319(c)(4) and Title 18, United States

Code, Section 2.

18

COUNT 4
(33 U.S.C. §§ 1318(a) & 1319(c)(4) and 18 U.S.C. § 2)
(false statements and aiding and abetting the same)

The Grand Jury further charges:

1.    The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34 are re-alleged and incorporated herein.

## I.    ADDITIONAL INTRODUCTORY ALLEGATIONS

2.    On September 21, 2010, a letter prepared in part by WMH and LOTTIG, was filed by WMH with the DOH-CWB.  It stated in part:

> WMH is committed to ensuring that the waters of the State are not adversely impacted by site activities and thus routinely modifies site features with Best Management Practices (BMPs) . . .  Therefore, WMH has initiated the following:
>
> - Installation of a 36-inch high density polyethylene (HPDE) (sic) and inlet to collect and direct site run-on storm water from up canyon of the Cell 6 (Partial) underneath the cell and into the existing concrete drainage channel.
>
> - Installation of a temporary diversion berm and rain flap on the up canyon end of Cell E-6 (Partial) to prevent site run-on from entering the cell (berm and rain flap to be installed following completion of the Cell E-6 (Partial) on approximately September 20, 2010 and prior to operation of the cell).
>
> - Installation of the Cell E-6 sump and pump to manage any storm water that collects within the cell.  Upon operation of the cell, any liquid collected in the sump would be managed as leachate.

3.    In truth and in fact, as WMH and LOTTIG well knew, all three measures, even when combined, were not BMPs because

19

they were incapable of preventing storm water from a 24-hour, 25-year up canyon storm from coming into contact with landfill wastes or preventing the discharge of contaminated storm water from the WGSL.

## II.  THE CHARGE

4.   On or about September 21, 2010, in the District of Hawaii and elsewhere, defendants

>    (a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agent JUSTIN H. LOTTIG, acting within the scope of his authority and on behalf of WMH; and

>    (b)   JUSTIN H. LOTTIG, individually,

did knowingly make, and aid and abet the making of, false material statements and representations in a letter dated September 21, 2010, and filed with the State of Hawaii Department of Health, Clean Water Branch, and required to be maintained, under Chapter 26 of Title 33 of the United States Code, that is, the Clean Water Act, 33 U.S.C. §§ 1251 et seq., with such false material statements and representations being more fully described above in paragraphs 2 and 3 of this count of the Indictment.

All in violation of Title 33, United States Code, Sections 1318(a) and 1319(c)(4) and Title 18, United States Code, Section 2.

<u>COUNT 5</u>
(33 U.S.C. §§ 1318(a) & 1319(c)(2)(A))
(failure to provide updated information to the DOH-CWB)

The Grand Jury further charges:

1.    The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34 are re-alleged and incorporated herein.

I.    <u>ADDITIONAL INTRODUCTORY ALLEGATIONS</u>

2.    Condition No. 9 of the 2005 NGPC and Condition No. 5 of the 2010 NGPC for the WGSL required the City or WMH to "[s]ubmit any changes to information on file with the CWB as soon as such changes arise, and [to] properly address all related concerns and/or comments to the CWB's satisfaction."

3.    From October 22, 2010, when Cell E6 went operational, and continuing thereafter through December 23, 2010, WMH did not have a storm water management system in place at the WGSL which could prevent run-on and run-off from a 24-hour, 25-year storm as required by Hawaii state law.

4.    WMH had informed the DOH-CWB, in its NOI Form B filed on June 15, 2010, that the January 2009 SWPCP (Rev. 3) would "continue to be implemented."  Section 4.1.1 of that SWPCP stated that "the active MSW [municipal solid waste] disposal area is covered at the end of each day with a minimum of 6 inches of daily cover soil."

5.    Notwithstanding Section 4.1.1 of the SWPCP, and beginning no later than October 27, 2010, on an irregular basis,

WMH covered the working face of Cell E6, that is, where waste had been placed that day, with a 24-mil thick polyethylene tarp, at least 30 feet by 100 feet, instead of a soil cover.  The tarp could not prevent a significant quantity of storm water from coming into contact with the waste placed underneath it.

6.   At no time between October 27, 2010, and December 23, 2010, did WMH inform the DOH-CWB that the storm water management system could not prevent a 24-hour, 25-year storm from mixing with the landfill waste or that a minimum six-inch soil cover was, at times, not being used to cover the waste placed in Cell E6 earlier that day.

## II.  THE CHARGE

7.   From October 27, 2010, and continuing thereafter until December 23, 2010, in the District of Hawaii, defendants

(a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agent JUSTIN H. LOTTIG, acting within the scope of his authority and on behalf of WMH; and

(b)  JUSTIN H. LOTTIG, individually,

did knowingly fail to inform the DOH-CWB of the material changes to the WGSL's storm water management system, as described above in paragraphs 3-6 of this count of the Indictment, in violation of Condition No. 9 of the 2005 NGPC, and Condition No. 5 of the 2010 NGPC, which were part of the NPDES Permits for the WGSL.

All in violation of Title 33, United States Code, Sections 1318(a) and 1319(c)(2)(A).

COUNT 6
(33 U.S.C. §§ 1311(a) & 1319(c)(2)(A)
and 18 U.S.C. § 2)
(knowing discharge of pollutants into a water
of the United States, in violation of an NPDES
Permit, and aiding and abetting the same)

The Grand Jury further charges:

1. The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34 and paragraphs 2 through 6 of Count 5 of this Indictment are re-alleged and incorporated herein.

I.   ADDITIONAL INTRODUCTORY ALLEGATIONS

(a)   The NPDES Permit Requirements for Best Management Practices at the WGSL

2. Comment 9 of the April 13, 2010, email from the DOH-CWB informed WHELAN that "[c]ontaminated storm water is storm water that comes into direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater. Some areas of a landfill that may produce contaminated storm water include (but are not limited to) the open face of an active landfill with exposed waste (i.e., areas exposed at any given time and before daily cover is provided). . . ." The April 13, 2010, email also required WHELAN and WMH to file a revised CWB-NOI Form B.

3. In their Response to Comment 9, filed with the DOH-CWB on June 15, 2010, WHELAN and WMH stated: "BMPs are in place to prevent contaminated storm water from coming into contact with landfill wastes. . . ."

23

4.    WHELAN and WMH also filed with the June 15, 2010,
Response to Comments, a revised CWB-NOI Form B.  In the revised
Form B, WHELAN and WMH informed the DOH-CWB that it would
continue to implement the existing SWPCP, that is, the January
2009 SWPCP (Rev. 3), which WMH also attached thereto.  Section
2.5.6 of that SWPCP provided that "[t]he surface water
management system for the landfill should prevent any discharge
of pollutants to U.S. waters or violation of water quality
regulations *by preventing run-off of surface water that has
contacted waste. . . .*" (emphasis added).

5.    Condition No. 7 of the 2010 NGPC required that WMH
comply with the General Permit, and all submittals filed after
the NOI dated October 5, 2007, which included the Form B filed
on June 15, 2010, and the January 2009 SWPCP (Rev. 3).

6.    In addition, HAR-11-55 Appendix B, Section 6(a) of
the NPDES permit required that the "permittee shall develop and
implement a storm water pollution control plan [SWPCP] to
minimize the discharge of pollutants in storm water runoff and
to maintain compliance with conditions of this general permit."

7.    Condition No. 3 of the 2010 NGPC required WHELAN
and WMH to "[i]mplement, operate, and maintain the facility's
SWPCP to ensure that storm water discharges associated with
industrial activities will not cause or contribute to a
violation of applicable State water quality standards (WQS)."

24

### (b). The waste disposed in Cell E6 from October 22, 2010, until December 19, 2010

8.    Beginning on October 22, 2010, and continuing thereafter on a regular basis until December 18, 2010, WMH placed millions of pounds of waste in Cell E6, despite having an inadequate storm water management system at the WGSL.  The waste included raw sewage and other "bar screen" waste, as well as treated sewage sludge, from wastewater treatment plants; incinerator residue (not incinerator ash) from the H-POWER plant; treated medical waste, including syringes, blood vials and catheters; dead animals; spoiled food; and other solid waste and garbage in the northern portion of Cell E6.  All of these wastes are "pollutants" as defined by the Clean Water Act.  33 U.S.C. § 1362(6).

### (c). The waste placed in Cell E6 on December 18, 2010, was not covered by soil

9.    On December 18, 2010, the following waste was placed in Cell E6: at least 16,000 pounds of "bar screen" waste (that is, waste which did not enter the Honouliuli Waste Water Treatment Plant for treatment), including an unknown quantity of raw sewage; at least 60,000 pounds of treated sewage sludge; at least 12,000 pounds of spoiled food; at least 256,000 pounds of incinerator residue, and at least 28,000 pounds of other municipal solid waste.  Some of this waste was not covered with

soil; instead, it was covered only by the tarp, which had a big tear in its middle.

### (d). The displacement of the tarp in Cell E6

10.   Beginning in the evening of December 18, 2010, or the morning of December 19, 2010, storm water from up canyon of the WGSL flooded into Cell E6, displacing the tarp which had covered most or all of the waste placed in Cell E6 on December 18, 2010.  At that point, there was little or no barrier between the waste buried in Cell E6 on December 18, 2010, and the incoming storm water.  Thereafter, the storm water mixed with and dissolved some or all of the raw sewage, sewage sludge, and the incinerator residue.  Other solid waste floated in the storm water.  All of the storm water which came into contact with those wastes became contaminated storm water, as defined by 40 C.F.R. § 445.2(b), Comment 9 of the April 13, 2010 email from the DOH-CWB, and under the 2010 NPDES Permit for the WGSL.

### (e). Knowing Discharges From Cell E6

11.   On December 19, 2010, WHELAN, with LOTTIG's agreement, directed a foreperson for a construction contractor at the WGSL to uncover an inspection manhole, known as "Inspection Manhole No. 4" of a large drainage pipe, known as a "HOBAS pipe," for the purpose of pumping the contaminated storm water from Cell E6 to the WGSL sedimentation basin.  WHELAN further directed the foreperson to hire pumps to pump the

26

contaminated storm water into the HOBAS pipe and, from there, to the WGSL's sedimentation basin. The foreperson followed those instructions and from December 19-23, 2010, millions of gallons of contaminated storm water were pumped from Cell E6 to the WGSL's sedimentation basin.

12. The WGSL sedimentation basin had two 42-inch diameter perforated drainage pipes, which were designed to discharge storm water after sediment and other pollutants had settled to the bottom of the basin. After leaving the basin through the two 42-inch pipes, discharged storm water would be conveyed to Hawaii coastal waters, that is, the territorial sea of the United States, via three outfall pipes used by the WGSL and located underneath Farrington Highway. The two 42-inch diameter drainage pipes, and the three outfall pipes, were each a "point source" as defined in the Clean Water Act, 33 U.S.C. § 1362(14).

13. Because WMH pumped so much contaminated storm water from Cell E6 into the sedimentation basin from December 19-23, 2010, there was insufficient time for the pollutants to settle in the sedimentation basin before the contaminated storm water was discharged from the WGSL through the two 42-inch pipes, reaching the three outfall pipes used by the WGSL, and then into the territorial sea of the United States.

14.    From on or about December 19-23, 2010, due to
WMH's failure to implement the January 2009 SWPCP (Rev. 3), WMH
discharged contaminated storm water, containing raw untreated
sewage and other bar screen waste; sewage sludge; incinerator
residue; and soil, all pollutants under the Clean Water Act, 33
U.S.C. 1362(6), in violation of the 2010 NPDES permit for the
WGSL.

15.    The storm water discharged from the WGSL from
December 19-23, 2010, reached the territorial sea of the United
States, and caused and contributed to the violation of Hawaii
State Water Quality Standards because the contaminated storm
water contained pollutants that caused and contributed the
territorial sea to: contain substances which settled and formed
objectionable sludge and bottom deposits, in violation of 11 HAR
54-4(a)(1); have an objectionable color, in violation of 11 HAR
54-4(a)(3); contain deleterious substances at levels which were
harmful to human, animal, plant, and aquatic life, and in
amounts sufficient to interfere with beneficial uses of the
water, in violation of 11 HAR 54-4(a)(4); and contain soil
particles, in violation of 11 HAR 54-4(a)(6).

## II.  **THE CHARGE**

16.   From December 20, 2010, and continuing thereafter until December 23, 2010, in the District of Hawaii and elsewhere, defendants

(a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agents JOSEPH R. WHELAN and JUSTIN H. LOTTIG, acting within the scope of their authority and on behalf of WMH;

(b)   JOSEPH R. WHELAN, individually; and

(c)   JUSTIN H. LOTTIG, individually,

knowingly discharged, and aided and abetted the discharge of, pollutants, namely, raw untreated sewage and other bar screen waste; sewage sludge; incinerator residue; soil; and contaminated storm water from point sources, namely, the WGSL's sedimentation basin's two drainage pipes and three outfall pipes used by the WGSL, into the territorial sea of the United States, a water of the United States, in violation of the 2010 NPDES Permit for the WGSL.

All in violation of Title 33, United States Code, Sections 1311(a) and 1319(c)(2)(A); and Title 18, United States Code, Section 2.

<u>COUNT 7</u>
(18 U.S.C. § 1001(a)(2))
(making a materially false statement)

The Grand Jury further charges:

1.    Paragraphs 2 through 15 of Count 6 of this Indictment are re-alleged and incorporated herein.   On December 20, 2010, two DOH-CWB inspectors met with JUSTIN H. LOTTIG at the WGSL.

2.    On December 20, 2010, in the District of Hawaii, defendants

> (a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agent JUSTIN H. LOTTIG, acting within the scope of his authority and on behalf of WMH; and

> (b)  JUSTIN H. LOTTIG, individually,

did knowingly and willfully make a materially false statement in a matter within the jurisdiction of the executive branch of the United States, that is, LOTTIG told DOH-CWB inspectors, who were enforcing the federal NPDES program, that storm water being discharged from the WGSL had not come into contact with solid waste when, in truth and in fact, as LOTTIG well knew, the storm water being discharged had come into contact with solid waste.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT 8
(18 U.S.C. § 1001(a)(2))
(making a materially false statement)

The Grand Jury further charges:

1.     Paragraphs 2 through 15 of Count 6 of this

Indictment are re-alleged and incorporated herein.   On December

23, 2010, DOH-CWB inspectors met with JUSTIN LOTTIG at the WGSL.

2.     On December 23, 2010, in the District of Hawaii,

defendants

> (a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its
> agent JUSTIN H. LOTTIG, acting within the scope of his
> authority and on behalf of WMH; and

> (b)  JUSTIN H. LOTTIG, individually,

did knowingly and willfully make a materially false statement in

a matter within the jurisdiction of the executive branch of the

United States, that is, LOTTIG told DOH-CWB inspectors, who were

enforcing the federal NPDES program, that when Cell E6 had last

been in operation on Saturday, December 18, 2010, a 12-inch

layer of intermediate soil "cover" had been placed over the

municipal solid waste at the end of the business day when, in

truth and in fact, as LOTTIG well knew, a tarp and not an

intermediate soil cover had been placed over waste placed in

Cell E6 on that day.

All in violation of Title 18, United States Code,

Section 1001(a)(2).

31

COUNT 9
(33 U.S.C. §§ 1311(a) & 1319(c)(2)(A)
and 18 U.S.C. § 2)
(knowing discharge of pollutants into a water
of the United States, in violation of an NPDES
Permit, and aiding and abetting the same)

The Grand Jury further charges:

1.    The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34, and paragraphs 2 through 15 of Count 6 of this Indictment, are re-alleged and incorporated herein.

## I.    ADDITIONAL INTRODUCTORY ALLEGATIONS

2.   On January 6, 2011, DOH personnel were present at the WGSL.   The DOH informed WHELAN that WMH was not authorized to pump any more of the contaminated storm water from Cell E6 into the WGSL storm water discharge system.

3.    As of January 12, 2011, Cell E6 contained the same types of pollutants as discharged from December 19-23, 2010, and identified in Paragraphs 8 and 9 of Count 6 of this Indictment.   In addition, other pollutants such as medical waste -- including syringes, blood vials, and catheters -- were in Cell E6, having been buried therein on various dates between October 22, 2010, and December 18, 2010.   These additional pollutants also were not authorized to be discharged to Hawaii coastal waters by the 2010 NPDES Permit for the WGSL.

### (a). The decision to leave Inspection Manhole No. 4 uncovered

4.     On January 11 or 12, 2011, with a forecasted storm approaching, WHELAN and R.V.P. examined the uncovered Inspection Manhole No. 4 via which the contaminated storm water had been pumped from Cell E6 to the sedimentation basin from Dec. 19-23, 2010. WHELAN asked R.V.P. whether the manhole should remain uncovered to serve as an overflow drain and R.V.P. advised that he thought it would be appropriate. WHELAN agreed and he decided to leave the manhole uncovered, but he did not inform the DOH-CWB of that decision or that contaminated storm water could be discharged as a result of that decision.

### (b). The discharge of pollutants on January 12-13, 2011

5.     Beginning on January 12, 2011, a very heavy storm hit leeward Oahu. Millions of gallons of storm water from the area up canyon of the WGSL flooded into Cell E6 and mixed with the waste and soil therein. Cell E6 overflowed and millions of gallons of contaminated storm water discharged through the uncovered Inspection Manhole No. 4 of the HOBAS pipe, and down into the sedimentation basin. The sedimentation basin, in turn, filled up and overflowed to such an extent that medical waste, raw untreated sewage and other bar screen waste, sewage sludge, incinerator waste (not ash), and solid waste flowed over the spillway of the sedimentation basin into the culvert below the

33

landfill and, from there, into the outfall pipes located under Farrington Highway. The contaminated storm water then exited those pipes and discharged the pollutants contained therein into the territorial sea of the United States.

6. From on or about the evening of January 12, 2011 or the morning of January 13, 2011, and due to WMH's failure to implement the January 2009 SWPCP (Rev. 3), WMH discharged contaminated storm water containing sewage sludge; incinerator residue; medical waste; and soil, all pollutants under the CWA, 33 U.S.C. 1362(6), in violation of the 2010 NPDES Permit for the WGSL.

7. In the morning of January 13, 2011, numerous loose syringes, blood vials, catheters and other medical waste were found in the four Ko Olina lagoons. Later that afternoon, additional syringes were found on the WGSL spillway just below the sedimentation basin. Other syringes and medical waste were found at and next to the WGSL outfalls near the Ko Olina beach and resort area and at other nearby beaches.

8. Enterococcus is an enteric bacteria which is used as an indicator of the presence of raw untreated sewage, sewage sludge, and other fecal contamination. A water sample taken on January 13, 2011, at the WGSL sampling site by Farrington Highway, had a concentration of 73,000 CFUs of enterococci. A water sample taken the same day from the outfalls used by the

WGSL had a concentration of 68,000 CFUs of enterococci.  Water samples taken at points in the ocean further removed from the three outfall pipes used by the WGSL had much lower levels of enterococci.

9.   The storm water discharged from the WGSL from on or about January 12, 2011 or the early morning of January 13, 2011, until on or about 6:00 p.m. or 7:00 pm on January 13, 2011, reached the territorial sea of the United States, and caused and contributed to the violation of Hawaii State Water Quality Standards because the contaminated storm water discharges caused and contributed the territorial sea to: contain substances which settled and formed objectionable sludge and bottom deposits, in violation of 11 HAR 54-4(a)(1); contain floating debris, in violation of 11 HAR 54-4(a)(2); have an objectionable color in violation of 11 HAR 54-4(a)(3); contain deleterious substances at levels which were harmful to human, animal, plant, and aquatic life, and in amounts sufficient to interfere with beneficial uses of the water, in violation of 11 HAR 54-4(a)(4); contain soil particles, in violation of 11 HAR 54-4(a)(6); and  contain over 104 CFUs of enteroccocus, in violation of 11 HAR 54-8(b).

## II.  THE CHARGE

10.  From on or about the evening of January 12, 2011, or the morning of January 13, 2011, and continuing thereafter until about 6:00 p.m. or 7:00 p.m. on January 13, 2011, in the District of Hawaii, defendants

> (a)  WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agent JOSEPH R. WHELAN, acting within the scope of his authority and on behalf of WMH; and

> (b) JOSEPH R. WHELAN, individually,

knowingly discharged, and aided and abetted the discharge of pollutants, namely, medical waste such as syringes, blood vials, and catheters; raw untreated sewage and other bar screen waste; sewage sludge; incinerator residue (not ash); municipal solid waste; enterococci bacteria; floating debris and other floating materials; and contaminated storm water from point sources, namely, the WGSL's sedimentation basin and its two drainage pipes, and the three outfall pipes used by the WGSL, into the territorial sea of the United States, a water of the United States, in violation of the 2010 NPDES Permit for the WGSL.

All in violation of Title 33, United States Code, Sections 1311(a) and 1319(c)(2)(A), and Title 18, United States Code, Section 2.

## COUNT 10
### (18 U.S.C. § 1001(a)(2))
### (making materially false statements)

The Grand Jury further charges:

1.    Paragraphs 2 through 9 of Count 9 of this

Indictment are re-alleged and incorporated herein.  On January

13, 2011, DOH-CWB inspectors met with J.F. at the WGSL.

2.    On January 13, 2011, in the District of Hawaii,

defendant

>    (a)  WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its
>    agent J.F., acting within the scope of his authority
>    and on behalf of WMH,

did knowingly and willfully make materially false statements in

a matter within the jurisdiction of the executive branch of the

United States, that is, J.F. made the following false material

statements to two DOH-CWB inspectors, who were enforcing the

federally authorized NPDES program, that:

>    (a) Inspection Manhole No. 4 of the HOBAS pipe was
>    closed to prevent the discharge of any of the
>    impounded water in Cell E6 when, in truth and in fact,
>    as J.F. well knew, Inspection  Manhole No. 4 was
>    intentionally left open to serve as an overflow drain;
>    and

>    (b) there had been no discharges from Cell E6 since
>    December 23, 2010, when pumping of the contaminated
>    storm water had ceased, when in truth and in fact, as
>    J.F. well knew, WMH had been discharging contaminated
>    storm water and solid waste since at least the morning
>    hours of that day.

All in violation of Title 18, United States Code,

Section 1001(a)(2).

## COUNT 11
(18 U.S.C. § 1001(a)(2))
(making a materially false statement)

The Grand Jury further charges:

1.   Paragraphs 2 through 9 of Count 9 of this Indictment are re-alleged and incorporated herein.  On January 20, 2011, DOH-CWB inspectors met with J.F. at the WGSL.

2.   On January 20, 2011, in the District of Hawaii, defendant

> (a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agent J.F., acting within the scope of his authority and on behalf of WMH,

did knowingly and willfully make a materially false statement in a matter within the jurisdiction of the executive branch of the United States, that is, J.F. stated to two DOH Clean Water Branch inspectors, who were enforcing the federally authorized NPDES program; to wit, that Inspection Manhole No. 4 of the HOBAS pipe had been closed from December 23, 2010, until January 13, 2011, when, in truth and in fact, as J.F. well knew, Inspection Manhole No. 4 of the HOBAS pipe had been intentionally left open from December 23, 2010, until January 13, 2011, to serve as an overflow drain.

All in violation of Title 18, United States Code, Section 1001(a)(2).

38

### COUNT 12
(33 U.S.C. § 1318(a) & 1319(c)(4) and 18 U.S.C. § 2)
(false statements and aiding and abetting the same)

The Grand Jury further charges:

1.   The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34, paragraphs 2 through 15 of Count 6, and paragraphs 2 through 9 of Count 9 of this Indictment are re-alleged and incorporated herein.

### I.   ADDITIONAL INTRODUCTORY ALLEGATIONS

2.   On March 17, 2011, the DOH-CWB sent a written Request for Information ("RFI") to WHELAN and WMH inquiring as to the circumstances surrounding the discharges of storm water from the WGSL in December 2010 and January 2011.

3.   On April 21, 2011, WHELAN, as General Manager of WMH, submitted a response, under penalty of law, that the statements contained therein were, to the best of his knowledge and belief, true, accurate, and complete.  In making that representation, and because WHELAN was a Vice President of WMH, WHELAN was a Responsible Corporate Officer, under the CWA, as provided by 33 U.S.C. § 1319(c)(6).

4.   The Response submitted by WMH and WHELAN contained the following materially false statements and omissions:

(a) DOH-CWB QUESTION: In Question 4, the DOH-CWB asked WMH the following: "*What did WMH do in preparation for, or in response to, rain events which occurred between December 1, 2010 and January 20, 2011?*"

THE RESPONSE: On page 8, the Response stated: "WMH also placed a pump in the northern part of the cell to pick up water in anticipation of the December 19 storm."

THE FALSE STATEMENT: In truth, no such pump was placed in the northern part of Cell E6, or in any other part of Cell E6, "to pick up water in anticipation of the December 19 storm."

(b) DOH-CWB QUESTION: In Question 4(b), the DOH-CWB asked WMH the following: "Include detailed information regarding activities associated with the E6 cell."

THE RESPONSE: On page 9, the Response stated: "Prior to the December 19-20 storm, WMH covered Cell E6 with soil in accordance with permit requirements."

THE FALSE STATEMENT: In truth, on December 18, 2010, the day before the storm, the active face of Cell E6 was covered at least in part with the tarp and not with soil. Once that tarp was displaced by the storm on December 19, 2010, there was no barrier between the waste previously covered by the tarp and the storm water in Cell E6.

c) THE RESPONSE: The Response to Question 4(b) stated: "The liquid [pumped from Cell E6] was stormwater, not leachate. WMH voluntarily informed DOH of the pumping from Cell E6 on December 20th. WMH advised DOH that it would continue such pumping on several occasions prior to December 23rd."

THE OMISSIONS: That statement omitted material facts. WMH never advised DOH-CWB that the tarp placed in Cell E6 had been displaced and that waste in Cell E6, including raw untreated sewage and treated sewage sludge, had come in contact with the storm water being discharged from Cell E6.

(d) DOH-CWB QUESTION: In Question 5, the DOH-CWB asked WMH the following: *"Did WMH conduct any activities at the Landfill which resulted in the discharges of storm water, potentially contaminated water (including contaminated storm water, leachate or any other landfill wastewater) or solid waste during between December 1, 2010 and January 20, 2011?"*

THE RESPONSE: On pages 9 through 11 of the Response,
WMH omitted material facts.  WMH never informed DOH-
CWB that Inspection Manhole No. 4 was intentionally
left uncovered to serve as an overflow drain, and that
millions of gallons of contaminated storm water from
Cell E6 had been discharged through the open manhole,
before seeking authorization from the DOH-CWB.

e)  DOH-CWB QUESTION: In Question 5(a), the DOH-CWB
asked WMH the following: *"Disclose all activities
conducted by WMH which may have purposefully or
inadvertently resulted in the storm water discharges
from the Landfill."*

THE RESPONSE: On page 11 of the Response, WMH omitted
the material fact that it had intentionally left
Inspection Manhole No. 4 uncovered and had discharged
contaminated storm water on January 12-13, 2011,
before the DOH-CWB authorized pumping, which began at
approximately 7:00 p.m. on January 13, 2011.

f)  DOH-CWB QUESTION: In Question 6, the DOH-CWB asked
WMH the following: *"Were there discharges of storm
water or any storm water mixture which was contained
in the E6 cell between December 1, 2010 and January
20, 2011."*

THE RESPONSE: On page 13, the Response stated, "No
further discharges of stormwater from Cell E6 occurred
between December 23, 2010 and January 13, 2011, when
Mr. Gill [Deputy Director of DOH] authorized WMH to
resume pumping and discharging stormwater."

THE FALSE STATEMENT: In truth, there were additional
discharges of storm water from Cell E6, via open
Inspection Manhole No. 4, as early as the evening of
January 12, 2011, and throughout the morning of
January 13, 2011, which were not disclosed to the DOH-
CWB before it authorized pumping from Cell E6.
g)  DOH-CWB QUESTION: In Question 6(a), the DOH-CWB
asked WMH the following:  *"Detail all discharges from
the E6 cell to the storm water drainage system for the
period.  Include time, date, estimated volumes,
responsible person(s), and any analytical data
associated with the discharges."*

THE OMISSION: On page 13, the Response again omitted
the material fact that WMH had discharged at least

41

thousands of gallons of contaminated storm water
through open Inspection Manhole No. 4 for several
hours in the morning of January 13, 2011, before
seeking authorization from DOH-CWB.

h) <u>DOH-CWB QUESTION</u>: In Question 7, the DOH-CWB asked
WMH the following: "Were there discharges of solid
waste from the Landfill to the storm water drainage
system between December 1, 2010 and January 20, 2011."

<u>THE RESPONSE</u>: On page 14, the Response stated:  "WMH
is aware of only one instance when solid waste
materials were discharged through the Landfill's storm
water drainage system.  Storm water was observed
overtopping the sedimentation basin when employees
arrived at the site early in the morning on January
13."  This statement omitted material facts because it
did not disclose, as WMH well knew, that the storm
water discharged from Cell E6 from December 19, 2010,
until December 23, 2010, was contaminated with solid
waste.

i) DOH-CWB QUESTION: In Question 8(a), the DOH-CWB
asked: "*Provide the Landfill's storm water management
plan.*"

THE RESPONSE: On page 15, the Response stated,
"Exhibits "12" and "13" are copies of WMH's current
SWMP and the SWMP that was in effect at the time of
the December-January storms."

<u>THE FALSE STATEMENT</u>: In truth, the SWMP which was in
effect in December 2010 and January 2011 was the SWMP
filed on August 30, 2010, and not the 2011 or the 2009
SWMPs provided by WMH and referenced, respectively, as
the current SWMP and the one that "was in effect at
the time of the December-January storms."

j) <u>DOH-CWB QUESTION</u>: In Question 8(c), the DOH-CWB
asked WMH the following: "*Detail how the Landfill's
storm water management plan either adequately or
inadequately addressed any storm event experienced
during the above referenced period.*"

<u>THE RESPONSE</u>: On pages 15 and 16, the Response stated
that the WGSL's Emergency Action Plan (EAP) "was
implemented preceding and following the December and
January storms."  One of the procedures required by

the EAP was that "Interim cover will be placed over exposed waste at the end of the working day prior to the forecasted beginning of a severe storm."  The Response stated that this and the other "procedures were completed before and following the storms."

THE FALSE STATEMENT: In truth, the synthetic tarp, and not a soil cover, was placed over some of the exposed waste at the end of the working day on December 18, 2010.  That tarp was displaced by the storm on December 19, 2010, and there was effectively no cover between the waste under the tarp and the storm water in Cell E6 on December 19, 2010.

## II.  **THE CHARGE**  .

5.    On or about April 21, 2011, in the District of Hawaii and elsewhere, the defendants

(a)  WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its agents JOSEPH R. WHELAN, JUSTIN H. LOTTIG, and J.F., acting within the scope of their authority and on behalf of WMH; and

(b)  JOSEPH R. WHELAN, as a Responsible Corporate Officer of WMH,

did knowingly make, and aid and abet the making of, false material statements and representations in the Response to the Request for Information filed with the State of Hawaii Department of Health, Clean Water Branch, and required to be maintained, under Chapter 26 of Title 33 of the United States Code, that is, the Clean Water Act, 33 U.S.C. §§ 1251 et seq., with such false material statements and representations being more fully described above in paragraph 4 of this count of the Indictment.

43

All in violation of Title 33, United States Code, Sections 1318(a) and 1319(c)(4) and Title 18, United States Code, Section 2.

## COUNT 13
(33 U.S.C. § 1318(a) & 1319(c)(4) and 18 U.S.C. § 2)
(false statements and aiding and abetting the same)

The Grand Jury further charges:

1.   The INTRODUCTORY ALLEGATIONS set forth above in paragraphs 1 through 34, paragraphs 2 through 15 of Count 6, and paragraphs 2 through 9 of Count 9 of this Indictment are re-alleged and incorporated herein.

### I.   ADDITIONAL INTRODUCTORY ALLEGATIONS

2.   On May 6, 2011, the EPA sent a written request for information, pursuant to section 308 of the CWA ("the section 308 letter"), to WHELAN and WMH inquiring as to the circumstances surrounding the discharges of storm water from the WGSL in December 2010 and January 2011.  On August 1, 2011, WHELAN, as General Manager of WMH, responded with a 17-page document, with his certification, under penalty of law, that to the best of his knowledge and belief, its contents were true, accurate, and complete.  In making those representations, and because he was both General Manager of WMH and its Vice President, WHELAN was a Responsible Corporate Officer pursuant to the Clean Water Act, 33 U.S.C. § 1319(c)(6).

44

3.   Question 12 of the section 308 letter asked for
"details regarding the storm event on or around 12/19/10. . ."
and it followed with specific questions.  One of the questions
was "Describe the status of the daily or intermediate cover
placed over the waste in E-6."  The response from WHELAN and WMH
was, in pertinent part, "[p]rior to the December 19, 2010 storm
event, daily cover consisting of a minimum of six inches of soil
was placed over the compacted waste material at the end of daily
operations."  That statement was false, as WHELAN and WMH knew,
because the tarp and not a minimum of six inches of soil was
placed over the waste in Cell E6 on December 18, 2010.

## II.   THE CHARGE

4.   On or about August 1, 2011, in the District of
Hawaii and elsewhere, the defendants

> (a)   WASTE MANAGEMENT OF HAWAII, INC. (WMH), via its
> agent JOSEPH R. WHELAN, acting within the scope of his
> authority and on behalf of WMH; and
>
> (b)  JOSEPH R. WHELAN, as a Responsible Corporate
> Officer of WMH,

did knowingly make, and aid and abet the making of, false
material statements and representations in a Section 308 letter
dated August 1, 2011, and filed with the United States
Environmental Protection Agency, and required to be maintained,
under Chapter 26 of Title 33 of the United States Code, that is,
the Clean Water Act, 33 U.S.C. §§ 1251 et seq., with such false

45

material statements and representations being more fully described above in paragraph 3 of this count of the Indictment.

All in violation of Title 33, United States Code, Sections 1318(a) and 1319(c)(4) and Title 18, United States Code, Section 2.

Dated: April 30, 2014, at Honolulu, Hawaii.

A TRUE BILL

/s/ Foreperson

Foreperson, Grand Jury

FLORENCE T. NAKAKUNI
United States Attorney
District of Hawaii

LESLIE E. OSBORNE, JR.
Chief, Criminal Division

MARSHALL SILVERBERG
Assistant U.S. Attorney

DANIEL W. DOOHER
Senior Trial Attorney
Environmental Crimes Section
U.S. Department of Justice

U.S. v. Waste Management of Hawaii, Inc., et. al.,
Cr. No. _____ (Indictment)